IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 8, 2006

## STATE OF TENNESSEE v. RONNIE R. CHARLESTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-B-883     Steve Dozier, Judge**

---

**No. M2005-02255-CCA-R3-CD - Filed January 5, 2007**

---

The defendant, Ronnie R. Charleston, was convicted of felony murder, especially aggravated robbery, and second degree murder. He was sentenced as a Range III, persistent offender to a total effective sentence of life imprisonment plus fifty-five years. On appeal, he presents two issues for our review: (1) whether the evidence was sufficient to support his convictions; and (2) whether the trial court erred in determining the length and the manner of service of his sentences. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Jeffrey A. DeVasher (on appeal), J. Michael Engle and Katie Weiss (at trial), Assistant Public Defenders, Nashville, Tennessee, for the appellant, Ronnie R. Charleston.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Rachel Sobrero and Pamela Sue Anderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The defendant was indicted on one count of felony murder, especially aggravated robbery, and first degree premeditated murder. The following evidence was presented at trial. On November 17, 2002, the victim, Israel Elbaz was found dead in his bakery located in the Bellevue Mall in Nashville. The victim had been stabbed multiple times in his torso and arms. He also had several blunt-force injuries and abrasions.

Gina Ryan testified that she was an office manager for Cumberland Labor, a temporary employment agency. She testified that she knew the victim as a client who used Cumberland Labor's services to procure temporary laborers for his restaurants. As she recalled, the defendant was sent to work for the victim as a cook. According to Ms. Ryan, on the morning of November 17, 2002, the defendant came into the employment office, yelling. He was upset about his pay of $7.50 per hour and wanted a pay raise. Ms. Ryan attempted to calm the defendant down but told him there was nothing she could do on Sunday. She promised, however, that she would talk to the defendant's temporary employer about a raise on Monday. After hearing this promise, the defendant calmed down. However, after the defendant used her phone to call someone, he again became agitated, slammed the phone down, and walked out of her office. On cross-examination, Ms. Ryan admitted that the defendant thanked her before leaving the office.

Kathryn Dillard testified that she was an independent accountant who met with the victim on Saturday, November 16, 2002, to discuss the bookkeeping for the victim's restaurants. Ms. Dillard testified that during the meeting the defendant approached the victim needing money for a paint brush. At this time, the victim reached into his pocket and pulled out a "big wad of money" and gave the defendant $5.00. Ms. Dillard stated that the defendant was in a position to see the victim's "thick stack" of money.

Mazel Elbaz, the victim's daughter, testified that her family owned a restaurant located in the Bellevue Mall called the "Family Cuisine." Additionally, the family was in the process of opening a bakery in the mall called the "Sweet Tooth Café." The new bakery was located four stores down from the restaurant. Ms. Elbaz stated that she worked with her father at the restaurant. She also recalled that her father would usually leave the back door of the bakery propped open in order to move from restaurant to bakery via the service entrance. According to Ms. Elbaz, her father had hired the defendant about two weeks before being killed. The defendant was hired to work in the kitchen.

Ms. Elbaz testified that her father always carried a lot of money. He carried petty cash in his right pocket and a larger amount in his left pocket. On Sunday, November 17, 2002, Ms. Elbaz and her father drove a Green Aerostar van to the mall to open the restaurant for breakfast. When they arrived, the defendant was waiting outside the mall entrance. He was to help with food preparation. While preparing the food, Ms. Elbaz observed the defendant using a specific restaurant knife to cut the lettuce and tomatoes. According to Ms. Elbaz, this specific knife was kept in the kitchen area of the restaurant behind the kitchen door, and no one other than herself, her father, the defendant, and her brother had access to this knife. The knife was identified at trial as Exhibit 10. Ms. Elbaz recounted that this specific knife was the knife that the defendant typically used to prepare food. Ms. Elbaz noted that from her position in the front of the restaurant she did not observe anyone go into the kitchen other than the victim, the defendant, and her brother.

Ms. Elbaz testified that her brother eventually arrived at the restaurant and took over her father's kitchen duties. At this time, she observed her father, the defendant, and a building contractor, Marty Mullennex, head over to the bakery. Later on, while serving the lunch crowd, Ms.

Elbaz walked over to the bakery to ask her father for help. As she approached the service entrance door to the bakery, she noticed that the door was barely propped open. She opened the door and walked down the hallway of the bakery. As she walked, she noticed that the Coke machine was "kind of half off the counter like it fell over." She started to "holler out, hello, is anybody here?" When no one answered, she proceeded to walk back to the bathroom area where she saw her father lying face down between the toilet and the wall. There was "red all over the wall." After standing for a few minutes in shock, Ms. Elbaz ran to get her brother. She then told her brother to go over to the bakery.

On cross-examination, Ms. Elbaz testified that about one-half hour before she went over to the bakery to find her father, she noticed the defendant walk in front of the restaurant headed for the mall exit. The defendant appeared to be in a hurry. At the time, she thought it unusual for the defendant to leave work so early. Ms. Elbaz stated that after the victim and the defendant left the restaurant to go to the bakery, her brother worked at the restaurant with her the entire time.

Jason Elbaz, the victim's son, testified that he and his sister worked for their father. His father owned a restaurant called the "Family Cuisine" and was planning to open a bakery called the "Sweet Tooth Café." Mr. Elbaz knew the defendant, who had started working for his father two weeks before his father's death. The defendant helped out in the restaurant preparing food and washing dishes. The defendant also did minor construction work on the side. According to Mr. Elbaz, one of the knives found at the crime scene, identified as Exhibit 10, was a specialized knife used in his father's restaurant for cutting vegetables and meat, and the defendant would often use this particular knife when preparing food. Furthermore, only employees of the restaurant would have access to the knife rack in the kitchen area of the restaurant. Mr. Elbaz also noted that the uniforms, consisting of a long white chef's coat and blue apron, were worn while working at the restaurant, and the defendant was wearing this uniform on November 17, 2002. Mr. Elbaz stated that his father drove a Ford Aerostar van.

Mr. Elbaz described the front of the bakery as under renovation with black cardboard in front of the mall entrance, which prohibited people from seeing the inside of the bakery. There was also a pull-down gate, which blocked entrance to the public. At the back of the bakery was a heavy metal door which opened to the service area of the mall. The door could only be opened from inside the bakery.

Mr. Elbaz testified that he arrived at the restaurant and had breakfast. While having his breakfast, the defendant sat down next to him. The defendant appeared anxious to go over to the bakery and start painting. After Mr. Elbaz finished breakfast, he took over his father's position on the grill, and his father and the defendant walked over to the bakery. Later, Mr. Elbaz needed help preparing food for the lunch crowd, so he asked his sister to go get their father to help. She left but immediately returned distraught. She told him that their father had fallen and needed help. Mr. Elbaz left the restaurant and went over to the bakery where he found his father lying in the bathroom with blood everywhere. He then ran out to the mall area to get help. According to Mr. Elbaz, about twenty minutes passed from when his father and the defendant walked over to the bakery and when

he went to help his father. Mr. Elbaz stated that he got blood on himself trying to save his father. He also stated that the next day, he went to pick up his father's van from the mall parking lot. After scouting the parking lot and not finding the van, he reported the van missing.

Joel Martin Mullennex testified that he was a self-employed carpenter doing some renovation work on the Sweet Tooth Café. On November 17, 2002, he went to the Bellevue Mall to discuss the work with the victim. Upon arriving around 11:00 a.m., he went to the Family Cuisine and met the victim and the defendant. The three men then walked over to the Sweet Tooth Café. While Mr. Mullennex was discussing the remodeling repairs with the victim, the victim noticed the drain in the Coke machine was overflowing and asked the defendant to clean up the mess. As the defendant was cleaning up the mess, the victim and Mr. Mullennex walked to the hallway and the victim gave Mullennex $500 to purchase supplies. The victim then placed the rest of the money back into his front pocket. Mr. Mullennex left to go pick up the supplies. While en route to Home Depot, he learned that something had happened at the Sweet Tooth Café. As a result, he drove back to the mall and talked with the police.

Bobby Freeman testified that he was cleaning the Bellevue Mall on November 17, 2002. At some point in the morning, he took a break and went outside to a service area known as "Dock A." While standing outside, he saw the defendant walking rapidly towards the Mall parking lot. Shortly thereafter, Mr. Freeman received a call that someone had been hurt at one of the restaurants in the food court area. Anna Foster testified that she took a break with her co-worker, Bobby Freeman. While standing outside near Dock A, she heard footsteps coming from the service hallway and saw the defendant rush out the door. As he passed, Ms. Foster heard the defendant mutter, "Oh shit." Later, after going back inside the mall, someone ran up to her and asked her to call for help because someone had been "hurt bad". In response, she called security.

Joe Perlen testified that he worked for a jeweler located in the Bellevue Mall. On November 17, 2002, around 12:00 p.m., he observed the victim, the defendant, and another man walk into the bakery. Around 12:30 p.m., he saw Jason Elbaz, the victim's son, running frantically throughout the mall, yelling "[m]y dad has been cut, my dad has been cut." As a result, Mr. Perlen went into the bakery to investigate. Jacqueline Sudano testified similarly. She was at the mall before it opened and saw Jason Elbaz running around screaming for help. She followed Jason into the bakery and saw the victim lying in the bathroom with "blood all over the place." She and Jason attempted to resuscitate the victim to no avail. Two other witnesses testified similarly. One of the witnesses, James Box, added that he used a small knife to cut the shirt off the victim when trying to resuscitate him. He left the knife wedged under the bathroom door.

Lewis Scruggs testified that he was the owner of a tavern and night club located on Murfreesboro Road. On November 17, 2002, before the tavern opened, the defendant came into the tavern and ordered a beer. The defendant had a rag tied around his hand and the rag had some blood on it. The defendant paid for the beer in cash taken from a roll of money. After Mr. Scruggs served the defendant, Mr. Scruggs went back to the kitchen. When he returned, he observed the defendant standing next to the pool table. After talking to the defendant for a little while, Mr. Scruggs told the

defendant the club was going to close. The defendant then offered Mr. Scruggs ten dollars for a ride up the street. Mr. Scruggs gave the defendant a ride to a burger place where the defendant ordered some food, then Mr. Scruggs dropped the defendant off at the corner of Murfreesboro Road and Lewis Street.

Mr. Scruggs testified that the next day he learned the police were looking for the defendant. Upon hearing this news, he became curious and walked over to the pool table where the defendant had been standing. As a result, he found a billfold in one of the pockets of the pool table. He opened the wallet and saw a photograph of the victim. Mr. Scruggs eventually called police and talked with Detective Corcoran. The police then searched Mr. Scruggs' van.

Detective Brad Corcoran of the Metropolitan Police Department testified that he led the investigation into the victim's homicide. After he was called to the crime scene located at the Sweet Tooth Café in the Bellevue Mall, he walked through a business which appeared under construction. Here, he observed the victim lying in the middle of the floor. Detective Corcoran observed considerable amounts of blood at the scene and signs of a struggle. After interviewing several witnesses, the defendant became the primary suspect.

Detective Corcoran testified that he attended the autopsy of the victim. He observed several stab wounds to the victim's chest and back. There were a total of nine stab wounds. Detective Corcoran testified that a sample of the victim's blood was collected as part of the investigation. Later on that afternoon, Detective Corcoran received a call from the victim's son, Jason Elbaz. Mr. Elbaz told him that a van was missing. After talking with Mr. Elbaz, Detective Corcoran issued a Be-On-The-Look Out (BOLO) for the missing van.

Detective Corcoran testified that on November 19, 2002, he spoke with Lewis Scruggs. Mr. Scruggs was the owner of a small tavern and believed he had information about the homicide. After talking with Mr. Scruggs, Detective Corcoran prepared a photographic lineup. Upon review of the lineup, Mr. Scruggs selected the defendant's photograph and noted that the defendant had been at his tavern. After learning the defendant was at the tavern and that Mr. Scruggs had given the defendant a ride in his van, Detective Corcoran proceeded to examine the van. Detective Corcoran observed what appeared to be blood in the front seat and several cigarette butts in the ashtray. Blood samples were collected from the seat. Detective Corcoran also retrieved the victim's wallet from Mr. Scruggs, which also had what appeared to be blood on it. The victim's social security card and various credit and business cards were inside the wallet but no cash was found in the wallet.

Detective Corcoran testified that when the defendant was taken into custody, he was wearing dark-colored pants, a white v-neck t-shirt, tennis shoes, and a jacket. There appeared to be blood on the defendant's t-shirt and jacket. There also appeared to be cuts on the defendant's hands. Eventually, a sample of the defendant's blood was taken. The blood sample, the defendant's clothing, and the rest of the collected evidence were sent to the Tennessee Bureau of Investigation (TBI) for analysis. On cross-examination, Detective Corcoran acknowledged that there had been

three unsolved aggravated robberies around the same month's time and in the general area of where the victim was killed.

Police Officer Christopher Brennan testified that on November 17, 2002, he investigated the crime scene at a bakery in the Bellevue Mall. During his investigation, he observed the bakery in disarray. He observed the victim lying on the floor near the bathroom area of the bakery. He noticed "blood transfer" on the door leading to the bathroom and on the walls of the bathroom. There was also blood on the floor of the bathroom. Officer Brennan also found "blood transfer" on the service entrance to the bakery. He collected several blood samples from the crime scene for future analysis.

Officer Brennan testified that he found a 6 ½ inch knife with a black plastic handle and a 3 inch blade with blood on it. The knife was wedged underneath the door of the bathroom. He found another 11 1/4 inch knife with a black plastic handle and a 6 inch blade with blood on it. This knife was discovered in the bathroom near the toilet. This knife was identified at trial as Exhibit 10. Officer Brennan also collected a dark blue apron with blood on it from the bathroom floor. Officer Brennan further investigated the van owned by the victim and the van owned by Mr. Scruggs. He noted that there was "blood transfer" on the passenger seat of Mr. Scruggs' van and on the steering wheel cover and passenger seat of the victim's van. There was also a blood-stained apron found in the victim's van. Photographs, collected by Officer Brennan, were introduced at trial including photographs of the "blood transfer" evidence, the knives, and the cuts to the defendant's hands.

Police Officer Tim Matthews testified that he took photographs of the crime scene, the victim, and the evidence collected at the crime scene. The photographs he took were introduced into evidence at trial. Detective James Bledsoe testified that he was called to the crime scene and took statements of witnesses. He noted that $1800 in cash was removed from the victim's left front pants pocket, and $418 in cash, a $9.00 check, and some change was removed from the victim's right front pants pocket. He described the money found on the victim as folded up in a pretty thick wad of bills. He also interviewed some individuals at Cumberland Labor including Gina Ryan and collected evidence from that office. Other police officers testified similarly as to their investigation and collection of the evidence at the crime scene. One officer, William Kirby, testified that a cook's shirt found at the crime scene had a pay stub belonging to the defendant in one of its pockets.

Special Agent Michael Turbeville, a TBI forensic scientist, testified that he received evidence in the form of clothing, blood samples collected at the crime scene, a wallet, two knives, blood samples and physical evidence collected from the victim's van, and blood samples and evidence collected from Lewis Scruggs' van. He also received blood samples from the victim and the defendant. Upon receipt of the evidence, Agent Turbeville conducted DNA comparison analysis on the evidence. According to Agent Turbeville, the blood on the defendant's t-shirt and jacket matched the defendant's DNA profile, but the blood on the defendant's shoes matched the victim's DNA profile. The blood on the eleven inch restaurant knife matched the victim's DNA profile. A small amount of blood found inside the victim's wallet matched the defendant's DNA profile. The blood found on the seat and steering wheel cover in the victim's van matched the defendant's DNA profile. The blood found on items in Lewis Scruggs' van matched the defendant's DNA profile.

The blood on a blue apron and white chef's shirt retrieved from the general crime scene matched the victim's DNA profile. On cross-examination, Agent Turbeville acknowledged that he only tested the evidence submitted to him.

Dr. Buce Levy, the county medical examiner, testified that the victim's autopsy revealed that he died from multiple sharp-force injuries, primarily to his torso and arms. Dr. Levy ruled the victim's death a homicide.

Phynetta Taylor, the defendant's fiancée, testified that she dropped the defendant off at work at the Bellevue Mall around 9:30 a.m. Prior to that time the defendant had gone to Cumberland Labor to pick up his paycheck. Taylor stated that the defendant did not call her to pick him up that day.

Based on the evidence presented, the jury found the defendant guilty of felony murder, second degree murder, and especially aggravated robbery. The trial court merged the defendant's conviction for second degree murder into his conviction for felony murder. The defendant was sentenced as a Range III, persistent offender. He received consecutive sentences of life imprisonment for his felony murder conviction and fifty-five years for his especially aggravated robbery conviction.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant first challenges the sufficiency of the convicting evidence. Specifically, he submits that the circumstantial evidence in this case does not exclude every reasonable hypothesis except guilt. Moreover, he submits that the evidence did not establish he intended to commit the alleged underlying felony at the time of the murder.

Upon review, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v.*

*Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

Relevant to this case, felony murder is the killing of another committed in the perpetration of or attempted perpetration of a robbery. Tenn. Code Ann. § 39-13-202(a)(2). A murder qualifies as felony murder if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). To convict for especially aggravated robbery, the evidence must establish that the defendant robbed the victim with a deadly weapon and the victim suffered serious bodily injury. *Id*. § 39-13-403(a). To convict for second degree murder, the evidence must establish that the defendant knowingly killed the victim. *Id*. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-11-302(b).

Initially, we note that the guilt of the defendant as well as any fact required to be proved may be established by direct evidence, by circumstantial evidence, or by a combination thereof. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, a criminal offense may be established exclusively by circumstantial evidence so long as the evidence excludes all other reasonable theories except that of the defendant's guilt. *See State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971). On appeal, this court must presume that the jury resolved all conflicts in the testimony and drew all reasonable inferences in favor of the state. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

In the case herein, we conclude that both the direct and mostly circumstantial evidence presented at trial was sufficient to support the defendant's convictions. Taken in the light most favorable to the state, the evidence established that the victim died from multiple stab wounds on November 17, 2002. About two weeks prior to the victim's death, the defendant was hired to work in the victim's restaurant and do some minor construction in his bakery. During the defendant's employment, he prepared food in the kitchen area of the restaurant with a specific kitchen knife. No one, other than the defendant, the victim, and the victim's son and daughter, had access to the kitchen where the knife was kept. On at least one occasion, the defendant was present to see that the victim carried a large amount of money on him. On November 17, 2002, the defendant went to Labor Services angry and dissatisfied with the amount of money the victim was paying him. After leaving Labor Services, the defendant went to work at the restaurant in the Bellevue Mall and was seen in the company of the victim shortly before the victim's death. In fact, minutes before the victim was discovered stabbed to death, the defendant was seen hastily leaving the mall when he was supposed to be working. After the victim was discovered, it was determined that the victim's wallet and van were missing. Also, found at the crime scene was the specific kitchen knife the defendant typically used to prepare food. The knife had the victim's blood on it. Later, the defendant went to

a tavern, took out a roll of money, and purchased a beer. The defendant then walked over to a pool table and discarded the victim's wallet. The defendant had cuts on his hands and blood on his shirt and jacket. The victim's blood was found on the defendant's shoes. The defendant's blood was found on the victim's wallet and in the victim's van. Also, a shirt, found at the crime scene, had a pay stub belonging to the defendant. Accordingly, based upon the direct and circumstantial evidence presented, we conclude that the jury could find the defendant guilty of the offenses of felony murder, second degree murder, and especially aggravated robbery beyond a reasonable doubt.

## II. Sentencing

The defendant next challenges the length and manner of service of his sentences. The defendant was ultimately sentenced to fifty-five years for his especially aggravated robbery conviction, sixty years for his second degree murder conviction, and life imprisonment for his felony murder conviction. The court merged the defendant's second degree murder conviction into his felony murder conviction and ordered the defendant's especially aggravated robbery conviction to run consecutively to his life sentence for felony murder, for an effective sentence of life imprisonment plus fifty-five years.

Appellate review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401. This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

Before a trial court sentences a convicted defendant, it must consider: (1) the evidence received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. *Id.* §§ 40-35-103, -210; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is also required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated in determining the sentence. *Id.* at 704-05.

## A. Range III, Persistent Offender

In challenging his sentences, the defendant first contends that the trial court erred by conducting its own investigation into the defendant's prior convictions and sentencing him as a persistent offender despite the fact the state only requested the defendant be sentenced as a multiple offender. The defendant submits that without the procurement of the additional convictions by the trial court, he would have been sentenced as a Range II, multiple offender.

The record reflects that the state filed a notice of intent to seek enhanced punishment, which listed the defendant's prior convictions as follows:

a)      Burglary, Second Degree, Davidson Criminal Court, case number C-8586, November 6, 1981;

b)      Robbery and Aggravated Assault, Davidson Criminal Court, case number C-8739, November 6, 1981;

c)      Grand Larceny, Davidson Criminal Court, case number 87-S-1454, November 20, 1987;

d)      Robbery, Davidson Criminal Court, case number 87-S-1460, November 20, 1987;

e)      Robbery, Davidson Criminal Court, case number 87-F-1518, November 20, 1987;

f)       Robbery, Davidson Criminal Court, case number 91-W-30, July 18, 1991;

g)      Mail Theft and Forgery, United States District Court, Middle District of Tennessee, May 28, 1987; and

h)      Escape, United States District Court, Middle District of Tennessee, November 16, 1990.

At the sentencing hearing, the state advised the trial court that it was offering certified copies of four robbery convictions incurred by the defendant. At this time, the trial court questioned the state as to the other convictions listed on the state's "Notice of Enhanced Punishment." The state responded that it was not contending that the defendant was "anything other than a Range Two Offender." However, upon further questioning by the court, the state acknowledged it made a mistake and contended that the defendant's additional convictions placed him as a "Range Three [O]ffender." The court paused the proceedings in order to procure certified copies of the additional convictions that were listed on the state's notice. After obtaining the copies of these convictions, the court found that the defendant had five prior C felonies; and therefore, the defendant was a Range III, persistent offender.

Upon review, we note that Tennessee Code Annotated section 40-35-202(a) provides that "[i]f the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial." *See also* Tenn. R. Crim. P. 12.3. If notice is filed late or is filed timely but is *otherwise defective*, the defendant must show prejudice before the notice will be rendered ineffective. *See State v. Carter*, 121 S.W.3d 579, 585 (Tenn.

2003) (citing *State v. Stephenson*, 752 S.W.2d 80, 81 (Tenn. 1988)); *State v. Debro*, 787 S.W.2d 932, 933-34 (Tenn. Crim. App. 1989). The purposes of the notice requirement are satisfied when the defendant is not misled or surprised by the state's decision to seek enhanced sentencing. *State v. Chase*, 873 S.W.2d 7, 9 (Tenn. Crim. App. 1993).

While the defendant correctly points out that the state did not specify in its notice what offender status it was seeking, the evidence in the record clearly establishes that the defendant had notice of the state's intent to seek enhanced punishment. The record shows that the state filed a "Notice of Enhanced Punishment" listing enough prior convictions to qualify the defendant as a Range III, persistent offender. The record also indicates that the trial court's inquiries were made regarding the convictions listed on the state's notice. As such, the court's action in requesting certified copies of some of the defendant's convictions listed on the state's enhancement notice was not only proper but commendable. Clearly, the defendant has failed to show prejudice, and therefore, he is not entitled to relief on this issue.

### B. Sentence Length

The defendant next contends that the trial court improperly enhanced his sentences for especially aggravated robbery and second degree murder. Specifically, the defendant submits that the trial court improperly considered enhancement factors: (6), (10), and (14). *See* Tenn. Code Ann. § 40-35-114. As an aside, the defendant also submits that the trial court erred in applying these enhancement factors contrary to the ruling of *Blakely v. Washington*, 542 U.S. 296 (2004).

Especially aggravated robbery and second degree murder are Class A felonies. Tenn. Code Ann. §§ 39-13-403(b), -210(c). The sentencing range for a Range III, persistent offender who commits a Class A felony is forty to sixty years. *Id.* § 40-35-112(c)(1). Starting at the midpoint in the range, the trial court should adjust the sentence length within the range as appropriate based upon the presence or absence of mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114.[1] *Id.* § 40-35-210(c). The weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the statutory sentencing guidelines and its findings are adequately supported by the record. *See State v. Souder*, 105 S.W.3d 602, 606 (Tenn. Crim. App. 2002).

In the instant case, the court found the following enhancement factors applicable:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;
(6) The personal injuries inflicted upon . . . the victim was particularly great;
(10) The defendant had no hesitation about committing a crime when the risk to human life was high;

---

[1] The defendant was convicted and sentenced prior to the June 2005 revisions to the sentencing act.

(14) The defendant abused a position of public or private trust . . . .

*See* Tenn. Code Ann § 40-35-114. The court specifically limited its application of enhancement factors (6) and (10) to the defendant's conviction for especially aggravated robbery. With regard to factor (1), the court found that the defendant had additional grand larceny convictions, federal escape, federal mail theft, and "at least, six misdemeanor convictions for assault, theft, unauthorized use of a motor vehicle, [and] multiple shopliftings." With regard to factor (6), the court found that the victim's bodily injuries resulted in his death; therefore, the factor was applicable because the injuries went beyond those injuries necessary to establish the defendant's especially aggravated robbery conviction. Applying factor (10), the court found that the defendant had no hesitation in committing the crime of especially aggravated robbery when the risk to human life was high. The court further found that the defendant abused a position of private trust as an employee of the victim. The court finally noted that it placed great weight on enhancement factor (1), the defendant's history of criminal convictions.

*Enhancement Factors (6) and (10)*

It is well-settled that statutory enhancement factors may not be applied if they are essential elements of the offense, or if they are inherent within the offense. *See Imfeld*, 70 S.W.3d at 704. Previously, this court has expressly held that sentence enhancement based upon particularly great injuries cannot be applied to the offense of especially aggravated robbery because serious bodily injury is an essential element of this offense. *See State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). In other words, proof of serious bodily injury will always constitute proof of particularly great injury. *See State v. Jones*, 883 S.W.2d 597, 602 (Tenn. 1994). For similar reasons, this court has also held that sentence enhancement based upon the high risk to human life cannot be applied to especially aggravated robbery because high risk to human life exists whenever a deadly weapon is used. *See Nix*, 922 S.W.2d at 903. Thus, the trial court improperly applied enhancement factors (6) and (10).

*Enhancement Factor (14)*

The application of the private trust factor "is a task that must be undertaken on a case by case basis." *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997). The sentencing court is directed to examine "the nature of the relationship" and whether that relationship "promoted confidence, reliability, or faith." *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). "If such a relationship or 'private trust' is shown, the State must then prove that the perpetrator abused that relationship in committing the crime." *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999).

Initially, we recognize that a relationship of private trust may exist between employer and employee. *See, e.g., State v. Grissom*, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997). Often, this factor is applied when an employer entrusts the employee with access to money (i.e. payroll, business records, bank accounts), and the employee steals from the employer. *See, e.g., State v. Elizabeth M. Clark*, No. E2002-01592-CCA-R3-CD, 2003 WL 22843171, *3 (Tenn. Crim. App., at Knoxville,

Dec. 1, 2003) (noting that defendant exploited her position as the bookkeeper to steal money from her employer); *State v. Kavious L. Newsom*, No. 02C01-9806-CR-00166, 1999 WL 588155, at *5 (Tenn. Crim. App., at Jackson, Aug. 6, 1999) (noting that store manager let others come into the store and steal). Moreover, we note "that the employee's presence on the employer's premises or work site when the offense is committed may be a strong indicator of an abuse of trust, especially when the status as employee enabled or facilitated the offense." *See State v. Antonio D. Richardson*, No. M2005-01161-CCA-R3-CD, 2006 WL 1173168, *10 (Tenn. Crim. App., at Nashville, May 4, 2006). Nonetheless, based upon our review of the record, we conclude that enhancement factor (14), abuse of private trust, was improperly applied in this case. Here, the record establishes that the defendant had been employed as a temporary employee for about two weeks. The defendant's only duties consisted of food preparation in the restaurant and some minor construction work in the bakery. Of course, some element of trust was inherent in this relationship as in all employer/employee relationships. However, beyond establishing the fact that the defendant was a temporary employee who worked in the victim's restaurant and used a kitchen knife to stab the victim, the evidence in the record neither established a relationship which promoted confidence, reliability, or faith, nor the abuse of such a relationship by the defendant when committing the offenses of especially aggravated robbery and second degree murder. Accordingly, we conclude that this enhancement factor does not apply to the defendant's convictions.

In sum, the record reflects that the court improperly applied enhancement factors (6), (10), and (14), but properly applied enhancement factor (1). The improper application of enhancement factors, however, does not necessarily lead to a reduction in a defendant's sentence. *State v. Winfield*, 23 S.W.3d 279, 284 (Tenn. 2000). Given the fact that the court properly considered and placed great weight on enhancement factor (1), we conclude that the court did not err in sentencing the defendant as a persistent offender to fifty-five years for his especially aggravated robbery conviction, and sixty years for his second degree murder conviction. *See State v. Gomez*, 163 S.W.3d 632, 659 (Tenn. 2005) (upon the finding of even one enhancement factor, the "statute affords to the judge discretion to choose an appropriate sentence *anywhere* within the statutory range") (emphasis added). Accordingly, the defendant is not entitled to relief on this issue.

### *Blakely v. Washington*

In *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), our supreme court concluded that *Blakely v. Washington* neither announced a new rule of constitutional law nor invalidated Tennessee's sentencing scheme, by which a trial court is permitted, rather than required, to enhance a sentence within the statutory range based on its finding of relevant enhancement factors. *Gomez* is binding authority. Accordingly, the defendant is not entitled to relief on this issue.

### C. Consecutive Sentencing

As his final issue, the defendant challenges the trial court's imposition of consecutive sentencing. Specifically, the defendant argues that the imposition of consecutive sentencing was

improper because there was insufficient evidence to support the court's finding that the defendant was a dangerous offender or that he had a record of extensive criminal activity.

A trial court may impose consecutive sentencing upon a determination by a preponderance of the evidence that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Therefore, pursuant to this code section, a trial court may impose consecutive sentencing if it determines any one of the following criteria applies:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). The criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. However, if the trial court imposes consecutive sentencing based solely upon a finding that the defendant is a dangerous offender, the court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). Additionally, the trial court should consider general sentencing principles including whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See Imfeld*, 70 S.W.3d at 708. It is within the sound discretion of the trial court whether or not to impose consecutive or concurrent sentences. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

As previously noted, the trial court ordered the defendant's fifty-five-year sentence for the especially aggravated robbery conviction be served consecutively to the defendant's life sentence for his felony murder conviction. The court imposed consecutive sentences after finding that the defendant was a dangerous offender and had a record of extensive criminal activity. *See* Tenn Code Ann. § 40-35-115 (b)(2), -(4). In imposing consecutive sentencing, the court made the following statements:

The Court does find, under [40-35-115], in terms of multiple convictions, that the Defendant . . . is an offender whose record of criminal activity is extensive, and that he is a dangerous offender whose behavior indicates little or no regard for human life, and has no hesitation about committing this crime or crimes in the past, in which the risk to human life is high.

I understand, under [*State v. Wilkerson*], I have to . . . consider[] the aggregate term. I understand that [the Defendant] already has a life sentence, as to Count One.

But, hopefully, those sentences will stand and he will serve out that Count One sentence. But, to make sure of that and, because of the severity of these offenses and in order to protect the public from further serious criminal conduct by this Defendant, the Court does find that consecutive sentencing is necessary, based on those factors and that case law and that statute.

[The Defendant], according to the presentence report, has prior parole revocations, multiple prior probation revocations; has this volume of convictions, many of which are personal, assaultive, violent offenses on his record.

So, it's apparent to me that consecutive sentencing is - - although not required - - is necessary.

In our view, these findings reflect that the trial court considered the sentencing principles and all relevant facts and circumstances required for the imposition of consecutive sentences. Here, the record clearly supports the court's finding of extensive criminal history. Moreover, the violent nature of the defendant's action in stabbing the victim multiple times with a kitchen knife before taking the victim's wallet and van support a finding that the consecutive sentences imposed reasonably relate to these serious crimes and are necessary to protect the public from further criminal activity by the defendant. Accordingly, the defendant is not entitled to relief on this issue.

## CONCLUSION

Following our review of the record and the parties' briefs, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE